IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY ERIC PROCTOR, CU-4530, )<br>    Petitioner, )<br> )<br>    v. )<br> )<br>PAUL J. STOWITZKY, et al., )<br>    Respondents. ) | Civil Action No. 06-753 |

Report and Recommendation

I. Recommendation:

It is respectfully recommended that the petition of Anthony Eric Proctor for a writ of habeas corpus be dismissed, and that a certificate of appealability be denied for lack of a viable federal constitutional issue.

II. Report:

Anthony Eric Proctor, an inmate at the State Regional Correctional Facility at Mercer has presented a petition for a writ of habeas corpus which he has been granted leave to prosecute in forma pauperis.

Proctor is presently serving an eight to twenty year sentence imposed, following his conviction, by a jury of third degree murder and violation of the uniform firearms act at Nos. CC 9402611 and CC 9404927 in the Court of Common Pleas of Allegheny County, Pennsylvania. This sentence was imposed on June 28, 1995.[1]

---

[1] See: Petition at ¶¶ 1-6 of the petition.

A timely notice of appeal to the Superior Court was filed on November 20, 1995.[2] There then ensued a number of procedural delays including the appointment of three separate counsel. The petitioner then filed a voluminous "concise" statement of the issues on appeal in the Court of Common Pleas.[3] The trial court then filed its opinion, and on August 27, 1997, the appeal was dismissed for failure of counsel to file an appellate brief, but preserving the petitioner's right to file a post-conviction petition.[4]

After a period of unsuccessful filings in this Court, the United States Court of Appeals for the Third Circuit, and the United States Supreme Court, on February 8, 2000, the petitioner filed a post-conviction petition in the Court of Common Pleas.[5] On December 7, 2000, the petition was dismissed.[6] A timely appeal was taken to the Superior Court in which the issues presented were:

> I. Was a volume of police reports fabricated to replace the authentic police reports that comprised the discovery documents to assure that the appellant be convicted of the criminal charges against him?
>
> II. Were seven (7) police reports among the discovery documents relative to the appellant being arrested and booked on a criminal homicide charge fabricated to avert a legal challenge to suppress the alleged confession upon which the case hinged?
>
> III. Was the pre-trial suppression hearing a complete sham where defense counsel argued the application of the legal principles in Commonwealth v. Goldsmith... to

---

[2] See: Exhibit 14 to the answer of the Commonwealth.

[3] See: Exhibit 16 to the answer of the Commonwealth.

[4] See: Exhibit 28 to the answer of the Commonwealth.

[5] See: Exhibits 39 and 40 to the answer of the Commonwealth.

[6] See: Exhibit 44 to the answer of the Commonwealth.

the facts of the appellant's case?

IV. Was the 1st "Miranda rights waiver" fabricated to enter into evidence statements of the appellant –under the guise of a prelude to a proffer of a confession to the homicide being investigated?

V. Was the 4th question and answer on the pre-interrogation warning form mis-characterized in a police report to rationalize detaining the appellant inside an interrogation room for well over seven (7) hours both after appellant had reportedly invoked his right not to answer questions outside the presence of a lawyer and after detectives reportedly responded by terminating questioning?

VI. Were the right of appellant violated under both <u>Brady</u> ... and <u>Miranda</u> ... when appellant was interviewed at the major crimes headquarters, and the questions of the interview were omitted from the police report?

VII. Was deception used to cover-up the absence of interrogatories where interrogatories were inevitable when the following information was used in a police report: 1) in re to: interview with suspect Anthony E. Proctor, and 2) all questioning was terminated at this time?

VIII. Where detective's attempts to call the appellant's attorney contrived and reported to deceive the appellant and the jury while furthering the purpose of the mis-characterization of the fourth question and answer on the pre-interrogation warning form?

IX. Where two questions – attributed to the appellant – fabricated to mask a violation of legal principles delineated in both <u>Edwards</u>... and <u>Minnick</u> ... concerning custodial interrogations?

X. Was the detective's response to the two questions – attributed to the appellant – fabricated both to comprise a conversation initiated by the appellant, and to establish a "waiver" of the appellant's previously invoked right to be free from interrogation outside the presence of an attorney?

XI. Was the information concerning the appellant's reported request for the presence of his attorney used as an extension of the mischaracterized fourth question and answer on the pre-interrogation warning form - in the police report - for the purpose of establishing the second (fabricated) waiver to be free from interrogation outside the presence of an attorney?

XII. Where the warnings to beware of the homicide victim and the appellant's response to those warnings - in the two (2) police reports containing those details -

strategically made to contrast each other for the purpose of eclipsing the fear inducing warnings conveyed to the appellant and his fearful response to those warnings?

XIII. Was the appellant's well publicized explanation for leaving Eddie's Restaurant - after seeing the homicide victim - because he did not want any trouble - removed from the police report attributed to the detective of whom the appellant had reportedly confessed and removed from the appellant's coroner's inquest hearing transcript for the purpose of destroying evidence that the appellant was attempting to flee the area to get away from the homicide victim at the time of the shooting - turned - homicide?

XIV. Was the location of the shooting - turned - homicide reinvented in the report attributed to the detective of whom the appellant reportedly confessed to bolster the reports containing the sole eyewitnesses' observations and the testimony of the detectives of whom the reports were attributed to the detriment of appellant's defense?

XV. Was the sole eyewitness used as a vehicle, by police, in reports of interviews with her - to convey "false" images of the appellant as the aggressor in the shooting - turned - homicide while obscuring the location and the actions of the homicide victim both before and during the shooting - turned - homicide?

XVI. Was the [alleged] confession and the reports of the sole eyewitness' observation composed in 3rd person linguistic form instead of the words of the appellant and the eyewitness for the purposes of both creating narratives and excluding the questions that elicited the observations of the eyewitness and the appellant's account of the shooting - turned - homicide to the detriment of appellant's defense.

XVII. Were epilogue type headings used upon several police reports for the purpose of encroaching upon the province of the jury and to prejudice the petitioner by instructing the jury that appellant's actions were nothing less than murder?

XVIII. Were the police reports that began with information concerning a drug investigation of which detectives were investigating someplace before their involvement in appellant's case contrasted against the information concerning the shooting - turned - homicide to prejudice the appellant by implying that the appellant was a part of the drug problems in that area?

XIX. Were (1) criminal charges of which appellant was not convicted and (2) language describing a photo of the appellant as a "criminal" used to unlawfully

attack the appellant's credibility?

XX. Where deceptive tactics used to double the credibility of the contents of the police report containing the (alleged) confession, where: 1) a second detective's name was used in a epilogue type heading 2) following the word officer "s" and 3) a plural form of the word detective was used when referring to one detective and 4) a shifting back and forth from third person (the written) to first person (I) was used when referring to the same detective?

XXI. Was deception used to mis-lead the jury into believing that the [alleged] confession recorded in the report was contemporaneously composed during the interview of the appellant where the detective is referred to as "the writer" ?

XXII. On direct appeal, did the two court appointed lawyers act as barriers between the appellant and the courts to inhibit the appellant from making issue - on direct appeal - the issues that comprise the frame-up used to assure his conviction?

XXIII. Did the trial court judge attempt to cause the appellant to waive his right to appeal the dismissal of the PCRA petition?[7]

On August 28, 2001, the Superior Court vacated the dismissal of the pro se post-conviction petition and remanded for the appointment of counsel and the filing of an amended post-conviction petition.[8]

On December 10, 2001, the Court of Common Pleas noted that the petitioner waived his right to counsel on direct appeal and granted him leave to file an appeal to the Superior Court within thirty days.[9] The petitioner's notice of appeal was filed, counsel was appointed to represent him and on December 13, 2002, counsel filed the appeal brief in the Superior Court.[10] In

---

[7] See: Exhibit 50 to the answer of the Commonwealth.

[8] See: Exhibit 52 to the answer of the Commonwealth.

[9] See: Exhibit 55 to the answer of the Commonwealth.

[10] See: Exhibit 60 to the answer of the Commonwealth.

that appeal, the issues presented were:

> I. The trial court erred in allowing testimony regarding prior bad acts committed by Mr. Proctor insofar as this evidence was irrelevant and highly prejudicial.
>
> II. When the accused presents alternative defenses of self defense and unreasonable belief voluntary manslaughter, the trial court errs by failing to explain to the jury the relationship between those defenses and by misstating even the basic statutory definition of voluntary manslaughter; trial counsel renders ineffective assistance by failing to object to the erroneous and inadequate instruction.
>
> III. When the accused presents alternative defenses of self defense and unreasonable belief voluntary manslaughter, the trial court errs by failing to explain to the jury the relationship between those defenses and by misstating even the basic statutory definition of voluntary manslaughter; trial counsel renders ineffective assistance by failing to object to the erroneous and inadequate instruction.[11]

On June 11, 2003 the judgment of sentence was affirmed.[12] A petition for allowance of appeal to the Pennsylvania Supreme Court was filed in which the sole issue raised was:

> Did the trial court err in allowing testimony regarding prior bad acts committed by Mr. Proctor insofar as this evidence was irrelevant and highly prejudicial?[13]

On October 16, 2003, the petitioner voluntarily discontinued his petition for leave to appeal.[14]

The petitioner, pro se, filed another post-conviction petition on October 28, 2003 which he amended on April 7, 2004.[15] That petition was dismissed on February 3, 2005 as meritless.[16] A pro se appeal was filed in the Superior Court in which the issues raised were:

---

[11] Id.

[12] See: Exhibit 61 to the answer of the Commonwealth.

[13] See: Exhibit 63 to the answer of the Commonwealth.

[14] See: Exhibit 64 to the answer of the Commonwealth.

[15] See: Exhibits 65 and 69 to the answer of the Commonwealth.

[16] See: Exhibit 73 to the answer of the Commonwealth.

> A. Did the PCRA court error by failing to address the issues presented in the PCRA petition and in the amendment thereof from which this appeal followed?
>
> B. Did trial court error by failing to suppress extrajudicial statements made by appellant while in police custody?
>
> C. Did trial counsel vitiate appellant's right to direct appeal by putting the appellant in the witness stand without the full and careful advise of counsel?
>
> D. Did trial counsel render ineffective assistance of counsel, which, in the circumstances of this particular case, so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place?
>
> E. Did direct appeal counsel render ineffective assistance of counsel by failing to raise issues herein after the appellant served him two memorandums outlining these issues?[17]

On February 23, 2006, the Superior Court affirmed the denial of post-conviction relief.[18] The instant petition was executed on June 6, 2006, and in that petition, Proctor contends he is entitled to relief on the following grounds:

> 1. The trial court erred by failing to suppress extrajudicial statements made by petitioner while in police custody.
>
> 2. Trial counsel was ineffective for failing to impugn the violations of petitioner's rights under the Miranda ruling before the Court.
>
> 3. Trial counsel, the prosecuting attorney and several City of Pittsburgh detectives suppressed the authentic police reports of the custodial interrogations and fabricated other legal documents to serve as substitutes for the "suppressed evidence" both (1) to conceal violations of petitioner's constitutional rights under the Miranda ruling and (2) to portray the petitioner as the aggressor in the shooting turned homicide.
>
> 4. Trial counsel vitiated petitioner's right to direct appeal by putting the petitioner on the witness stand without the full and careful advise of counsel, thus rendering petitioner's direct appeal hollow and meaningless.

---

[17] See: Exhibit 77 to the answer of the Commonwealth.

[18] See: Exhibit 79 to the answer of the Commonwealth.

5. Appeal counsel was ineffective in his representation of the petitioner when he failed to raise the issues of trial counsel's ineffectiveness.

It is provided in 28 U.S.C. §2254(b) that:

An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

This statute represents a codification of the well-established concept which requires that before a federal court will review any allegations raised by a state prisoner, those allegations must first be presented to that state's highest court for consideration. Preiser v. Rodriguez, 411 U.S. 475 (1973); Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484 (1973); Doctor v. Walters, 96 F.3d 675 (3d Cir. 1996).

It is only when a petitioner has demonstrated that the available corrective process would be ineffective or futile that the exhaustion requirement will not be imposed. Preiser v. Rodriguez, supra.; Walker v. Vaughn, 53 F.3d 609 (3d Cir. 1995).

If it appears that there are available state court remedies, the court must determine whether a procedural default has occurred. If a procedural default has occurred, the court must determine whether cause or prejudice exists for the default, or whether a fundamental miscarriage of justice would result from a failure to consider the claims. Carter v. Vaughn, 62 F.3d 591 (3d Cir. 1995).

In construing § 2254(d)(1), the Court in Williams v. Taylor, 529 U.S. 362, 412-413 (2000) stated:

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state-court adjudication resulted in a decision that (1) "was

8

contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

In <u>Hameen v. Delaware</u>, 212 F.3d 226, 235 (3d Cir. 2000), the Court determined:

The Court in <u>Williams v. Taylor</u> held that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, further held that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." The "unreasonable application" inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Thus, under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." The Court in <u>Williams v. Taylor</u> made it clear that the "contrary to" and "unreasonable application"clauses have independent meaning.

That is, habeas corpus relief may only be granted in instances where the state court decision was contrary to or was an unreasonable application of clearly established Supreme Court case law or resulted from an unreasonable determination based on the facts before the Court. <u>Douglas v. Cathel</u>,      F.3d      (3d Cir.2006).

The Commonwealth concedes that with the exception of the petitioner's fourth issues, the issues which the petitioner seeks to raise here have been timely presented to the courts of Pennsylvania for their consideration in the first instance and for this reason are properly before

9

this Court for consideration. As to the fourth issue, the Commonwealth concedes that the petitioner can no longer raise that issue in the Pennsylvania courts and that as a result of procedural default, he is barred from raising it here.

The factual backgrounds of this case as set forth in trial court's July 9, 1997 opinion denying post-trial motions[19] wherein it observed:

> [D]uring the daylight hours of February 14, 1994 Pittsburgh narcotics detectives were conducting surveillance in the Hill District section of Pittsburgh. At approximately 11:50 A.M. Sergeant Nathan Harper was on Wiley Avenue when he heard gunshots coming from an area behind him. In his rear view mirror he saw the defendant run onto Perry street, away from where the gunshots had been heard, jump into a red Toyota "4-Runner", and drive rapidly down Wiley Avenue.
>
> Detective Leo O'Neill was in an unmarked vehicle at the corner of Elmore and Rose, a block or so away from Wiley, when he too heard the gunshots. While driving in the direction of the gunshots, he observed a red Toyota "4-Runner" travel at a high rate of speed from where the gunshots had originated. The vehicle ran through a stop sign and Detective O'Neill began to pursue it. The vehicle was eventually stopped. The defendant was driving and, as he approached the vehicle, Detective O'Neill noticed a strong odor of marijuana wafting from the vehicle. While the detectives were removing the defendant from his vehicle, it was reported over the police radio that an individual had fled from the scene of a shooting driving a red vehicle. The defendant was detained and subsequently transported to the Zone 2 Police Station.
>
> Detective Brian Weismantle, after transporting defendant to the police station, searched the area from where the shooting had occurred and where the defendant was stopped. He located a Glock .40 caliber handgun in a vacant lot.
>
> The victim, Charles Williams, was found lying face down on the sidewalk of Perry street. He had been shot eight times. At least four of the bullets entered the defendant's back or buttocks; none entered from the front. Twelve .40 caliber casings were found lying on the sidewalk and formed a trail from where the body was found on Perry around the corner to Wiley Avenue. A bag containing marijuana was also located on Wiley Avenue near where the trail of casings began...

---

[19] See: Exhibit 27 to the Answer of the Commonwealth.

>After an atomic absorption test was conducted at about 2:00 P.M., the defendant was advised of his rights and, after orally agreeing to speak with the officers, began to relate what had occurred that morning. After a few minutes he stopped and requested that attorney Jim Ecker be contacted. Attorney Ecker could not be reached and the defendant thereafter did not speak to these officers.
>
>At approximately 4:00 p.m. Detective Dennis Logan arrived for the evening shift. Detective Logan entered the interview room where the defendant was seated and advised him that he would transport him to the Coroner's office for arraignment. The defendant responded that the shooting was "not what it looked like" and began to explain what had happened. Detective Logan interrupted him and again advised him of his right to remain silent. The defendant orally waived his rights and proceeded to give his version of what had occurred earlier that day. According to Detective Logan, the defendant said that he shot the victim after the victim approached him. He said that he was afraid that the victim intended to rob him. After firing three shots at the victim near his vehicle, he chased the victim and continued firing. When the victim fell, the defendant stood over him and shot him three more times as he lay on the sidewalk. The defendant admitted throwing his weapon into the lot on Wiley as he fled.

The first two issues which the petitioner seeks to raise here is that the trial court erred in failing to suppress his extrajudicial statements, and that counsel was ineffective in failing to have those statements suppressed as being secured in violation of Miranda. The Commonwealth places reliance on Stone v. Powell, 428 U.S. 465 (1976) wherein the Court held that where the state courts provide an opportunity for a full and fair hearing on a Fourth Amendment claim, the matter is not subject to review by a federal habeas court. However, we deal here with a Fifth Amendment claim, which is subject to independent review by a federal habeas court. Miller v. Fenton, 474 U.S. 104 (1985). Under such circumstances, the state court finding of historical facts is subject to a presumption of correctness, 28 U.S.C. 2254(e), however, the application of these facts to the appropriate legal standard, is subject to independent review. Thompson v. Keohane, 516 U.S. 99, 112-113 (1995).

In its May 27, 1997 opinion, the trial court observed:

> This Court's ruling on the suppression motion was based on its determination that the Commonwealth witnesses were more credible. The Court accepted that the defendant was warned by Detective Logan of his rights under the Miranda decision when the defendant began to speak of the incident and that the defendant waived those rights and agreed to speak with the detective. A defendant, after invoking his right to not be questioned without the presence of counsel, may waive that right and agree to give a statement.  The Commonwealth was only required to prove by a preponderance of the evidence, that the defendant's waiver was voluntary and intelligent... The evidence accepted by this Court as credible clearly established that defendant's choice to speak with Detective Logan was both voluntary, that is, not the result of undue pressure from law enforcement, and intelligent.[20]

The transcript of the suppression hearing held on April 26, 1995 (TT.3-121) reveals that the petitioner was advised of his right to remain silent and not to make any statement without the presence of counsel (TT.24-26); that the petitioner indicated that he understood his rights (TT.26); that the petitioner then commenced speaking about the events and was again advised of his rights (TT.28); that the petitioner indicated that he desired to speak with his counsel (TT.28); that the petitioner was again advised of his rights (TT.26-30); that the petitioner then indicated that he did not desire to speak without consulting counsel (TT.27) and that all questioning ceased (TT.30); that unsuccessful attempts were made to contact petitioner's attorney on two separate occasions (TT.32); that during that time period no further attempt was made to speak to the petitioner (TT.33); that the petitioner then stated that he desired to explain what had happened (TT.47-48); that the petitioner was again advised of his Miranda rights (TT.48-49); that the petitioner indicated that he understood his rights (TT.49); that the petitioner indicated that he still desired to speak to the officers (TT. 49-50); that the petitioner then related his version of events (TT.51) and that no promises or threats were made to the petitioner (TT.52).

The petitioner also testified at the suppression hearing and stated that he had indicated that

---

[20] See: Exhibit 27 to the answer of the Commonwealth at pp.9-10 .

he did not want to speak about the incident until he had consulted counsel (TT.87, 89, 90, 91, 106); that he was not readvised of his rights (TT.94); that he spoke to the detective "off the record" (TT.94, 95); that he was shackled and had not eaten (TT.95) and that with the passage of time he began to speak about events (TT.108).

The trial court made a determination of credibility and did not exclude the evidence which the petitioner had sought to suppress. Thus, there is no basis for concluding that the determination was contrary to clearly established Supreme Court case law nor involved an erroneous application of that law as determined by the Supreme Court and the petitioner's argument provides no basis for relief.

The petitioner also contends that counsel was ineffective in arguing the alleged Miranda violation. In determining a claim of ineffective assistance of counsel, the standard enunciated in Strickland v. Washington, 446 U.S. 668 (1984) is employed. That standard requires a demonstration that counsel's performance was deficient and as a result the representation provided fell below an objective standard of reasonableness. Douglas v. Cathel, supra.

As discussed above, counsel filed a suppression motion, participated in the suppression hearing and unsuccessfully argued the motion (TT.112-118). The fact that the argument was a losing one does not demonstrate an inadequacy on the part of counsel, and the petitioner's argument fails.

The petitioner next contends that the prosecutor, defense counsel and Pittsburgh detectives conspired to suppress evidence which would have been favorable to his defense. In reviewing this matter, the trial court concluded:

This Court has thoroughly reviewed the record and finds no support for his claims.

13

> In addition, the defendant offers no support in his Petition for his bald assertion that everyone involved in his case conspired to illegally convict him. He did not identify any witness who would testify in support of his allegations. He also did not attach to the Petition any documents that support his claims. [21]

The petitioner argues this unsupported allegation by suppositions which lead to an erroneous conclusion. Rather, here, the findings of the trial court are entitled to a presumption of correctness, 28 U.S.C. 2254(e), and there is nothing in the record to suggest otherwise. For this reason, this allegation is likewise meritless.

The next issue which the petitioner seeks to raise here is that counsel was ineffective by "vitiat[ing]" his rights to appeal by having him testify without fully informing him of the consequences of his testifying. When considering this issue on appeal, the Superior Court wrote:

> [T]o the extend that Proctor's *pro se* PCRA petitions assert that trial counsel provided ineffective assistance in directing Proctor to testify during the suppression hearing without fully and carefully advising him of his rights, we conclude that this claim also is unsupported by any evidence of record. Simply stated, Proctor failed to reveal the specific advice that was so unreasonable as to vitiate Proctor's otherwise intelligent decision to testify. Moreover, even if Proctor had identified the nature of counsel's allegedly unreasonable advice, we observe that Proctor's failure to set forth any applicable case law in his appellant brief to support this argument would render the issue waived.[22]

This finding is entitled to a presumption of correctness.

Additionally, at the suppression hearing, the petitioner argued that his statements to the police were made in violation of his Miranda rights, while the police testified that his Miranda rights were scrupulously observed. Since the ultimate resolution of this matter was for the court, the only manner in which the petitioner could present his contrary allegations was to testify.

---

[21] See: Exhibit 46 to the answer of the Commonwealth at p.3.

[22] See: Exhibit 79 to the answer of the Commonwealth at p.4.

The petitioner also testified at trial (TT. 646-735). During his testimony, he stated that he did not in fact have a licence to carry a firearm, and that he shot the victim in self-defense. Again, the argument of self-defense had to be presented by the petitioner and for this reason his testimony was essential. Had he not testified, his conviction would have been a certainty.

Tactical decisions of counsel do not provide a basis for habeas corpus relief unless they fall below an objective standard of reasonableness. Deputy v. Taylor, 19 F.3d 1485 (3d Cir.), cert. denied 512 U.S. 1230 (1994). Here, the only possible defenses which the petitioner could raise were that his Miranda rights were violated and that he acted in self-defense. And, the only way those defenses could be presented was through the petitioner's testimony. Thus, counsel cannot be deemed ineffective for presenting this necessary testimony in the only manner possible. Indeed, counsel might be deemed ineffective if he had failed to do so.

The final argument raised by the petitioner is that his counsel on direct appeal was ineffective for failing to raise the alleged ineffectiveness of trial counsel after the petitioner provided him with two memoranda outlining trial counsel's inadequacy. In reviewing this issue, the Superior Court observed:

> Proctor's assertions are based on the underlying contention that trial counsel conspired with the Commonwealth to fabricate evidence and conceal the invalidity of Proctor's confession. In dismissing Proctor's PCRA Petition, the PCRA court concluded that the record belied Proctor's underlying conspiracy claim. Since we conclude that the record supports the trial court's finding that Proctor failed to make an offer of proof warranting a hearing on his claims, we affirm the Order dismissing his PCRA Petition.
>
> * * *
>
> A PCRA court may decline to hold a hearing on the petition if the petitioner's claim is patently frivolous and without a trace of support either in the record or from other evidence...

15

> Proctor's ... petitions failed to assert facts warranting an evidentiary hearing on the underlying claim that trial counsel conspired to conceal evidence that Proctor's confession was constitutionally infirm. As the PCRA court accurately noted, Proctor failed to name a single witness that would testify in support of his bald assertion or identify any evidence that would otherwise support his claim.[23]

Counsel determines what matters to raise on appeal, and cannot be deemed ineffective for failing to raise frivolous matters. Sistrunk v. Vaughn, 96 F.3d 666 (3d Cir.1996).

Thus the record in this case while demonstrating considerable confusion and rambling, demonstrates that the petitioner's conviction was not secured in a manner contrary to decisions of the Supreme Court of the United States nor involved any misapplication of the Court's determinations to the existing facts. Accordingly, it is recommended that the petition of Anthony Eric Proctor for a writ of habeas corpus be dismissed and that a certificate of appealability be denied.

Within thirteen (13) days after being served, any party may serve and file written objections to the Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

                                                     Respectfully submitted,

                                                     s/Robert C. Mitchell,

Entered: August 21, 2006                       United States Magistrate Judge

---

[23] See: Attachment79 to the Answer of the Commonwealth at pp.4-6.